IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| LUIZ RICK SANCHEZ, AL-4780, | ) | |
| Petitioner, | ) | No. C 15-1629-CRB (PR) |
| vs. | ) ) | ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS |
| SCOTT FRAUENHEIM, Warden, | ) | |
| Respondent. | ) ) ) | |

Petitioner, a state prisoner at Pleasant Valley State Prison, seeks a writ of habeas corpus under 28 U.S.C. § 2254 challenging a conviction and sentence from Alameda County Superior Court.  For the reasons set forth below, the petition is denied.

## STATEMENT OF THE CASE

On March 29, 2012, a jury convicted Petitioner of second degree murder of his mother's husband, Humberto Diaz.  The jury also found true an allegation that Petitioner had discharged a firearm causing great bodily injury.  On May 12, 2012, the trial court sentenced Petitioner to forty years to life in state prison.

Petitioner unsuccessfully appealed his conviction to the California Court of Appeal and the Supreme Court of California.  He also unsuccessfully sought habeas relief from the state courts.  On May 21, 2014, the Supreme Court of California denied Petitioner's final petitions for state habeas relief.

On April 9, 2015, Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court.  Per order filed on August 7, 2015, the Court found that the petition stated cognizable claims under § 2254, when liberally construed, and ordered Respondent to show cause why a writ of habeas corpus should not be granted.  Respondent filed an answer on November 20, 2015.  Petitioner did not file a traverse.

<strong>STATEMENT OF THE FACTS</strong>

The California Court of Appeal summarized the facts of the case as follows:

**A.      The Prosecution Case**

**1.      Background**

In September 2010, [Petitioner] was 55-years-old, had custody of this two young grandsons, and lived with his mother, Juanita Diaz, and Juanita's husband, Humberto, in the Diaz's Union City home.[1]  Humberto earned money for the family working as a hod carrier, while [Petitioner] stayed at home and took care of Juanita, who had a broken pelvis and other serious medical problems.  Humberto, who had been married to Juanita for more than 30 years, was only a few years older than [Petitioner], and the two men did not get along well.  According to Juanita, they argued all the time, Humberto constantly complained about [Petitioner], and he repeatedly tried to get him to move out of the house.[2]

On September 11 or 12, [Petitioner] and Humberto had a loud argument in front of Juanita.  Arturo Raygoza, a family friend who was working on a construction project at the Diaz house, could hear people arguing from outside.  During the argument, [Petitioner] chastised Humberto for not treating Juanita well.  He complained that Humberto was "messing around" while [Petitioner] was doing everything he could to care for Juanita.  [Petitioner] also accused Humberto of trying to have sex with his daughter Anna, who was the mother of the two young boys who lived with [Petitioner] at the Diaz home.  During the argument, Humberto told [Petitioner] to move out, as he often did.  And, at one point, both men threatened to kill each other.  The next day, Humberto told Juanita that he planned to kick [Petitioner] out of the house and to change the locks.

/

/

---

[1]For clarity, we use first names when referring to Juanita, Humberto and [Petitioner's] daughter, Anna Sanchez.

[2]Sanchez testified that Humberto was three years older than him and 12 years younger than Juanita.  Juanita died before trial, but excerpts from her March 23, 2011, preliminary hearing testimony were read to the jury.

## 2.	September 14, 2010

September 14 started as a normal day.  Humberto got up early and went to work and [Petitioner] cared for Juanita who spent the day in bed as she normally did.  Raygoza was at the house for most of the day, working on the construction project, a small addition to the back of the house.  At some point during that day, Juanita told [Petitioner] that Humberto had told her that he was going to change the locks.

Shortly after 4:00 p.m., Humberto arrived home from work.  As was his habit, he went around the outside of the house to look at the construction project before going inside to check on Juanita.  From an outside entrance, Humberto went into the new room, which was connected to the main house through another door leading into the kitchen.  Humberto seemed happy with the progress of the project as he and Raygoza talked about plans for installing a new water heater.  They knelt down on the floor facing each other, with the diagram in between them, and discussed the parts they would need to buy.

Humberto was facing the kitchen door and Raygoza was kneeling opposite him when [Petitioner] entered the room from the kitchen.  Raygoza heard [Petitioner] say "I told you not to fuck with me," and then he heard a "pop."  Raygoza looked up and saw a dark mark on Humberto's white t-shirt on the left side of his chest.  A second or two later, there was a second "pop."  Humberto looked down at his chest.  He seemed scared and like he might be in shock as he got to his feet and ran toward the door leading outside.  Raygoza heard a third shot before Humberto was out the door.  Raygoza looked at [Petitioner] who was pointing what appeared to be a semi-automatic gun directly at Humberto.  After firing the third shot, [Petitioner] "just turned around and walked back into the kitchen" through the interior door.

Raygoza had trouble believing these events were real; he thought for a moment that perhaps [Petitioner] was just "messing" around with a pop gun.  But, when he went outside, he found Humberto lying on the cement next to Raygoza's truck, trying to breathe.  Raygoza spent a few minutes going back and forth between his truck and the back of the house looking for his phone to call 911.  He heard voices inside the house and he heard [Petitioner] say " 'I told you I was gonna do something to him.' "

Inside the house, Juanita had heard a few loud "pops," but she did not think much about it until [Petitioner] came into her room and said "you are husbandless," and told her that Humberto was dead.  [Petitioner] did not appear agitated or excited but spoke in a monotone voice.  Juanita suggested that [Petitioner] did not mean what he was saying.  But when [Petitioner] said it was true, she made herself get up and used her walker to go to the front door where she saw Humberto lying motionless on the ground.  Juanita could not go down the front steps, but [Petitioner] did go outside.  He asked Raygoza if he had called 911 and Raygoza confirmed that he had.  Then [Petitioner] walked toward Humberto.  As he stood over the body, [Petitioner] appeared angry and agitated and he began yelling and screaming, telling Humberto "fuck you."

## 3.	The Investigation

When police arrived, they drew their weapons and ordered [Petitioner] and Raygoza to raise their hands in the air.  [Petitioner] complied and, as he walked out

from behind the truck, he said "I'm the shooter." The officer placed handcuffs on [Petitioner] and Raygoza. Then, as [Petitioner] sat on the curb next to the police car, he told Raygoza "Sorry. You shouldn't have been here."

The police videotaped [Petitioner] as they questioned him for several minutes about the location of the gun. [Petitioner] denied any remorse, saying "The one person that I wanted to hurt is hurt and that's all that matters." He also attempted to justify his decision to shoot Humberto, telling the officers that the man was married to his mother and had tried to rape his daughter, that he treated [Petitioner's] grandchildren "like shit," and that he was going to throw [Petitioner] and the boys out into the street. Ultimately, [Petitioner] told police where he had hidden the gun and gave them permission to search the house.

During the ride from the crime scene to the police station, [Petitioner] did not appear agitated; he was calm and quiet for the entire ride. At the station, police found a .25-caliber live bullet in the pocket of [Petitioner's] pants. At the house, they recovered a .25 caliber semi-automatic handgun in a coffee can on top of the refrigerator in the kitchen. There were no live rounds left in the magazine or chamber of the gun.

A firearm expert from the county Sheriff's office tested the gun recovered from the Diaz home. The loading mechanism did not function properly; two out of three times, the bullet was ejected before it was chambered. The recoil spring was worn, and the trigger did not pull easily.

An autopsy was performed by Dr. Thomas Rogers, who determined that Humberto died from multiple gunshot wounds. Rogers documented three different entrance wounds, but he only recovered two bullets from inside Humberto's body. At trial, Rogers acknowledged that a bullet which entered through Humberto's arm could have exited at the inside of the arm and re-entered the body at his torso. Thus, the autopsy findings were consistent with either two or three shots having been fired.

## B.   The Defense Case

### 1.   Anna Sanchez

[Petitioner's] daughter Anna testified that she was 13 when she went to live with her father at the Diaz home. [Petitioner] had always been the father figure for Anna's own children, and he moved with them to Ohio for several years before they all returned to Union City in 2005. The family left Ohio after an ex-boyfriend assaulted Anna and they moved back into the Diaz home because they had no place else to live.

Anna admitted that, from 2006 until 2009, she had a serious methamphetamine drug addiction. As a result of this habit, she was frequently jailed and her behavior was not acceptable to Juanita, who kicked her out of the Diaz house in 2006. Anna left her children with [Petitioner] and signed her welfare benefits over to him. Although Juanita never forgave her or let her back into the house, Anna saw [Petitioner] often and was very aware of the situation in the home. Anna felt that Humberto was unkind to Anna's children; he made them feel like they were not part of his family and he did not treat them as well as he treated other grandchildren.

4

Anna admitted that, when she was struggling with her addiction, she would do "pretty much" anything for money to support her habit.  After she moved out of the Diaz house, she developed a "friendship" with Humberto, who gave her money "here and there" to help out, even though he almost certainly knew she would use the money for drugs.  At some point during this time, Anna used a social security settlement to buy a truck, but the truck was impounded, and she needed $2,000 to get it back.  She asked Humberto for the money and promised to repay him.  Instead, he asker her to agree to have sex with him.  Anna did agree, but always made excuses and never did have a sexual relationship with him.  Humberto continued to give Anna money, but Anna felt that he grew increasingly angry with her for not keeping their agreement, and she thought that he took his frustration out on [Petitioner] and the children, who were still living in his home.

By 2010, Anna viewed herself as a mediator between [Petitioner] and Humberto and she testified that she personally witnessed many of their arguments.  For example, they argued about the way Humberto treated Juanita and they also argued about the fact that Humberto would not let [Petitioner] move into a vacant bedroom.

Anna testified about three telephone conversations she had with her father during the two-day period before he shot Humberto.  First, she spoke with [Petitioner] on September 12, after he had a major argument with Humberto.  Anna recalled that [Petitioner] was extremely angry, that she talked with him about the problems he was having with Humberto, and tried to assure him that everything was fine, and that they would not be put out on the street.

Anna also recalled two telephone conversations with [Petitioner] on the afternoon of September 14, 2010.  During the first call, [Petitioner] was extremely angry at Humberto.  According to Anna, [Petitioner] does not anger easily and she had never heard him that mad; she could "just sense the anger that was coming through the phone," and she recalled that "It's not like my dad at all."  A short time after this first conversation ended, Anna received a second phone call from [Petitioner] telling her to come and pick up the children because "the incident had took place."

## 2.    [Petitioner's] Testimony

Testifying on his own behalf, [Petitioner] attempted to explain to the jury how tensions between himself and Humberto built up over the five-year period prior to the fatal shooting.  According to [Petitioner], when he, Anna and the boys moved into the Diaz home in 2005, both Juanita and Humberto welcomed them, and the extended family got along well even though Humberto had a lot of "rules."  However, as time went on, several serious conflicts arose and remained unresolved.

First, [Petitioner] and Humberto had conflicts regarding Anna.  According to [Petitioner], Juanita kicked Anna out of the house because she broke one of the house rules by having a friend over.  Anna became homeless and turned to Humberto for money, which he gave her on a regular basis.  [Petitioner] told Humberto not to give Anna money because she used it to buy drugs, but he knew that Humberto kept giving her money behind his back.  [Petitioner] was not happy about the situation, but Anna told him to stay out of it, and he was afraid that if he challenged her she would take her kids away from him.

5

[Petitioner] admitted that Anna told him that the reason Humberto kept giving her money was because he thought Anna was going to have sex with him. Anna told [Petitioner] she would never do that, but that if Humberto was "stupid" enough to think she would, then she was going to keep taking his money.

[Petitioner] testified that he and Humberto rarely talked about Anna, but he did recall a big argument in late 2009. Humberto told [Petitioner] that Anna had stolen something from his truck and [Petitioner] did not agree or disagree. Humberto said he knew it was true and that he just wanted [Petitioner] to confirm it so that he could have some friends "break her legs." [Petitioner] recalled that he got really "pissed off," but he could not show any anger because he was always worried that Humberto would throw him and the children out of the house. [Petitioner]'s trial counsel asked if [Petitioner] had felt that Humberto was threatening to break Anna's legs in order to "provoke" him. [Petitioner] responded, "No. I thought it was because he was just upset with her because she wouldn't give up sex. And he had given her a lot, a lot of money by that time." With some additional prompting from this attorney, [Petitioner] testified that he was angry about Humberto's threat to break Anna's legs, but that he "[b]ottled it up inside and just walked away."

During this same time period, late 2009, [Petitioner] and Humberto also had a disagreement about sleeping arrangements at the Diaz home. Humberto's uncle, Carlos Llamas, had been living in a bedroom in the house for most of 2009. Llamas was terminally ill and Humberto paid [Petitioner] $400 a month to care for him until he died at the end of that year. [Petitioner] had been staying in the living room with his two grandchildren and he wanted to move into Llamas's old room, but Humberto would not let him. Around this same time, [Petitioner] was cleaning out Llamas's things when he discovered a gun hidden in the back of the bedroom closet.

According to [Petitioner], Humberto never liked [Petitioner]'s grandchildren. But, by the fall of 2009, his behavior toward them became "a lot, lot worse." For example, [Petitioner] bought bikes to give the children for Christmas but Humberto threw them in the dumpster. Another time, [Petitioner] bought a puppy but Humberto would not let them keep it. He would pop their balls, throw away their scooters and skateboards and did just "thousands of little things" that upset [Petitioner]. [Petitioner] testified that he and Humberto frequently argued about them. According to [Petitioner], Humberto knew that picking on the children was something "that would aggravate me very much."

In addition, the two men had conflicts about Juanita, who had suffered a stroke in 2009 and was in declining health. According to [Petitioner] Juanita could no longer care for herself and he took full responsibility for her care. However, Humberto objected to the way that [Petitioner] took care of Juanita; Humberto wanted her to be more independent which [Petitioner] did not think was realistic. [Petitioner] also felt that Humberto mistreated Juanita.[3] When they argued about

---

[3]Juanita's daughter, Eva Hauck, spent a lot of time at the Diaz home. She was 17 when her mother married Humberto, and when her own children were young, Juanita took care of them at the house. Hauck testified that Humberto

Juanita, Humberto often told [Petitioner] to get out o f the house, but [Petitioner] would respond that the house belonged to Juanita, that she was the boss and that she wanted him there.

Two days before the shooting, [Petitioner] and Humberto had yet another fight during which Humberto tried to kick [Petitioner] out of the house.  [Petitioner] testified that Humberto started the argument by blaming [Petitioner] for a mess that the construction crew had left in the kitchen.  Humberto told [Petitioner] he was useless and to move out.  [Petitioner] was "livid" because he felt that he did so much work around the house.  He moved the argument to Juanita's room because he wanted her to hear what he had to say.

[Petitioner] used the September 12 argument as an opporutnity to show Juanita that Humberto was a liar.  He told her that Humberto was cheating on her, that he had tried to "hook up" with Anna, and that he gave Anna money for drugs.  Juanita got really upset when she heard that Humberto gave Anna money but he just said that she needed it.  [Petitioner] testified that he was very angry during the argument and admitted that he and Humberto both threatened to kill each other.  However, after about 10 or 15 minutes of arguing, Humberto said there was no big deal and that "it's not important."  At that point, Juanita asked [Petitioner] to leave the room so she could talk to Humberto in private.  After another 15 mintues, Humberto came out of the room and said that [Petitioner] and the boys did not have to move out.

After the September 12 argument, Humberto started to ignore [Petitioner] and acted as though he was not even there.  [Petitioner] thought the matter was finally settled, that Juanita had won the argument, and that he was going to stay in the Diaz house and take care of her.  However, two days later, Juanita called [Petitioner] into her room and told him Humberto wanted him and the boys out of the house by the next day and that he was going to change all the locks on the house.  [Petitioner] became really upset, explaining his feelings to the jury in this way: "It's just an accumlation of three-and-a-half years of him just picking on me, always badgering me, getting in my face, saying things, what he did with my daughter, what he did with treating the kids, all that accumulation of things just kind of built up in me.  I just couldn't take it anymore."

When Humberto came home a short time later, [Petitioner] was on the phone with Anna and he told her he had to go because he wanted to try to talk Humberto out of kicking them out.  However, when [Petitioner] said they needed to talk, Humberto just ignored him, raised his hand in a dismissive manner and went outside to talk with Raygoza.  [Petitioner] testified that Humberto's behavior just made him "snap," and that he "lost it right there."  He went into the bedroom closet and retrieved the gun.  He went to the doorway between the kitchen and the new addition, said "I told you not to fuck with me," and then shot Humberto at least twice.  Then he put the gun in the coffee can on top of the refrigerator and went and helped his mother out onto the front porch where they saw Humberto still alive, lying on the concrete.

---

was good to her children, gave them financial support and was also known as a person who helped everyone.  Hauck also believed that Humberto had taken good care of Juanita after she became ill.

### C.    Incriminating Statements and Conversations

In October 2010, [Petitioner] wrote to Anna from jail and warned her that when they spoke in person, they would have to be "discreet" about the way they said things because "they might be listening or recording our conversation."

On July 18, 2011, Anna was interviewed by a defense investigator named Walter Stannard.  Anna told Stannard that [Petitioner] was aware of and approved of Anna's "playing" around with Humberto in order to get money from him.  She reported that she had told her father that Humberto had propositioned her for sex when the incident occurred and [Petitioner] understood that she was playing along because she needed money.  Anna also told the investigator that she spoke to [Petitioner] on September 14, before the shooting, and during that conversation [Petitioner] said "'I'm going to kill the motherfucker.'"

After Anna's interview, [Petitioner] wrote several letters to her in which he discussed the statements she had made to the defense investigator.  In an August 9, 2011, letter, [Petitioner] wrote: "When you told me that you said to the interviewer that I called you & told you what I was going to do.  That sent a red flag & warning bells off in my head.  I know you probably didn't mean to but you just might [have] sent my case in favor of the D.A."  The letter continued: "I think you made it look like pre-meditated murder because I never told nobody that I had called you."  [Petitioner] also wrote: "Damn I fucked-up & didn't try & figure out how to get our stories straight.  My fault.  My stupid mistake."  The following paragraph of this letter states:

"But who knows, if the D.A. doesn't know we talked he might not ask you any questions concerning that because without your testimony of you saying that you talked to me just before the incident the D.A. doesn't have nothing really substantial against me.  Then I have a very good chance of having my murder charges dropped to a voluntary manslaughter."

[Petitioner] ended his August 2011 letter by telling Anna that "[w]ere going to have to start getting [ourselves] more organized & our stories straight now that my case is going to trial.[4]

In a September 20, 2011, letter, [Petitioner] told Anna: "My one big question now is I'm wondering if my lawyer will treat me different.  You know, my lawyer had this certain opinion of me.  Now because of what you said will that change & will he start treating me and this case differently.  Because I had him totally convinced that this wasn't pre-meditated, but with what you might of said to the investigator I think he's going to look at me in a whole new way."  In this letter, [Petitioner] also

---

[4]In this same letter, [Petitioner] asked Anna a series of yes or no questions, and told her to provide answers using a code.  [Petitioner] wrote: "The thing is I'm going to ask them in a numbered sequence & I want you to answer the questions in the same order.  [¶] Example: I'll be writing a No.# then a question [¶] . . . then you write the No.# with your answer = 1. yes or no & so on.  Got it?  Here it goes.  [¶] . . . Did you tell the interviewer that I called you just minutes before I did what I did? [¶] . . . Did you say that I was going to shoot Beto? . . . Did you say to the interviewer I was very angry?

wrote: "Did you tell the investigator anything that might give him the idea I was gonna harm Beto in any way? [¶] [Yes or No?] [¶] Because I'm going to have to play off that. So really think hard & go over in your mind all that the two of you talked about (you & the investigator)." And, later in the letter, [Petitioner] wrote, "Now that I'm getting closer to a trial, I'm trying to prepare myself. I'm really trying hard to see if I can get my murder charge dropped to a voluntary manslaughter."

Before [Petitioner's] trial commenced, Anna sent him a letter in which she wrote: "I am gonna to be testifying real soon, so I want to have everything fresh in my head. I know you already told me, however, I need to know what you want me to say or not say about the phone calls that day. I know you said for sure that the locks were gonna be changed the day he came home early and that really pissed you off. But, what was the reason you completely snapped. *Very important* your attorney & investigator has asked me more than once."

While Anna was testifying at trial, the prosecutor asked her about the letters she and [Petitioner] wrote to each other while [Petitioner] was in jail awaiting trial. Anna maintained that she and [Petitioner] did not try to get their stories straight. She explained that [Petitioner] was simply trying to think things through. According to Anna, [Petitioner] genuinely did not recall having two phone conversations with her on the day of the shooting. Also, he just wanted to clarify what she had said to the investigator. When asked whether part of her motivation for testifying was to help [Petitioner] accomplish his goal of getting his "murder charge dropped to a voluntary manslaughter," Anna responded "Yes sir. Why wouldn't I?"

## D.    The Jury and the Verdict

The jury was instructed regarding three types of homicide: first degree murder; second degree murder and voluntary manslaughter, based on a heat of passion theory.

The prosecutor argued that [Petitioner] committed murder not manslaughter; that [Petitioner] hated Humberto and was angry at him, but that he did not kill under a heat of passion. The defense theory was that [Petitioner] was guilty of manslaughter, not murder. Defense counsel conceded that his client was not innocent, but argued that the homicide was a manslaughter because there was a "build up of provocations" that occurred over the year or year and half before the homicide occurred and that there was also a "sudden quarrel" that happened two days before the shooting, as well as an "immediate provocation" just before the shooting, when Juanita told [Petitioner] that Humberto was going to kick him out of the house.

The jury received a "guilty" and a "not guilty" special verdict form for each of the three homicide offenses. On March 29, 2012, the jury returned two of the special verdicts, one finding [Petitioner] not guilty of first degree murder and one finding him guilty of second degree murder.

People v. Sanchez, No. A135424, 2014 WL 710940, at **1–6 (Cal. Ct. App. Feb. 25, 2014) (footnotes renumbered).

## STANDARD OF REVIEW

This Court may entertain a petition for a writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412–13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of

1   the state court decision.  Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003).

2   While circuit law may be "persuasive authority" for purposes of determining whether a

3   state court decision is an unreasonable application of Supreme Court precedent, only the

4   Supreme Court's holdings are binding on the state courts and only those holdings need be

5   "reasonably" applied.  Id.

6                                    **CLAIMS & ANALYSIS**

7          Petitioner raises three claims for relief under § 2254: (1) insufficiency of the

8   evidence; (2) instructional error; and (3) prosecutorial misconduct.  The claims are

9   without merit.

10         **1.     Insufficiency of the Evidence**

11         Petitioner claims that "the evidence was insufficient to sustain the jury's second

12  degree murder verdict."  Pet. (dkt. #1) at 2.  He specifically argues that there was

13  insufficient evidence to support a finding that he acted with malice or to support a finding

14  "that the prosecution disproved heat of passion beyond a reasonable doubt."  Id. at 8.  The

15  claim is without merit because the California Court of Appeal reasonably determined that

16  substantial evidence supported the jury's second degree murder verdict.

17         Federal habeas corpus relief is available to a prisoner who claims that the evidence

18  was insufficient to support his state conviction only where, considering the trial record in

19  the light most favorable to the prosecution, "no rational trier of fact could have found

20  proof of guilt beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 324 (1979).

21  This standard is applied with reference to the substantive elements of the criminal offense

22  as defined by state law.  Id. at 324 n.16; Sarausad v. Porter, 479 F.3d 671, 678–79 (9th

23  Cir. 2007).

24         If confronted by a record that supports conflicting inferences, a federal habeas

25  court "must presume—even if it does not affirmatively appear in the record—that the trier

26  of fact resolved any such conflicts in favor of the prosecution, and must defer to that

27

28                                          11

resolution." Jackson, 443 U.S. at 326.  A jury's credibility determinations are therefore

entitled to near-total deference.  Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004).

Indeed, "it is the responsibility of the jury—not the court—to decide what conclusions

should be drawn from evidence admitted at trial."  Parker v. Matthews, 132 S. Ct. 2148,

2152 (2012) (quoting Cavazos v. Smith, 132 S. Ct. 2, 4 (2011) (finding Ninth Circuit

erred by substituting its judgment for that of California jury on question whether

prosecution's or defense's expert witnesses more persuasively explained cause of death)).

Except in the most exceptional of circumstances, Jackson does not permit a federal habeas

court to revisit credibility determinations.  Bruce, 376 F.2d at 957–58.

Under 28 U.S.C. § 2254(d), a federal habeas court applies the standard of Jackson

with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.

2005).  A federal habeas court must ask whether the operative state court decision

reflected an "unreasonable application of" Jackson to the facts of the case.  Id. at 1275.

Under California law, "murder is the killing of a human being . . . with malice

aforethought."  Cal. Penal Code § 187(a).  A killing with malice aforethought constitutes

first degree murder if it is willful, deliberate and premeditated.  Id. § 189.  All other kinds

of murders are of the second degree.  Id.  Second degree murder is therefore the unlawful

killing of a human being with malice, but without the additional elements (i.e., willfulness,

premeditation and deliberation) that would support a conviction of first degree murder.

People v. Chun, 45 Cal. 4th 1172, 1181 (2009).  Manslaughter, a lesser included offense

of murder, is an unlawful killing without malice.  Cal. Penal Code § 192.

Malice may be express or implied.  Id. § 188.  Malice is express "when there is

manifested a deliberate intention unlawfully to take away the life of a fellow creature."

Id.  It is implied "when no considerable provocation appears, or when the circumstances

attending the killing show an abandoned and malignant heart."  Id.  Case law establishes

that implied malice has both a physical and a mental component.  The physical component

is satisfied by the performance of an act, the natural consequences of which are dangerous to life.  The mental component is the requirement that the defendant knows that his conduct endangers the life of another and acts with a conscious disregard for life.  <u>Chun</u>, 45 Cal. 4th at 1181.

Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter.  Heat of passion arises if, "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment."  <u>People v. Beltran</u>, 56 Cal. 4th 935, 942 (2013) (citation and internal quotation marks omitted).  A heat of passion theory of manslaughter has both an objective and a subjective component.  <u>People v. Moye</u>, 47 Cal. 4th 537, 549 (2009).  To satisfy the objective or reasonable person element of this form of voluntary manslaughter, the accused's heat of passion must be due to sufficient provocation.  <u>Id.</u>  "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim, or be conduct reasonably relieved by the defendant to have been engaged in by the victim . . . .  The provocative conduct by the victim may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."  <u>Id.</u> at 549–50 (citations and internal quotation marks omitted).  "The focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly."  <u>People v. Najera</u>, 138 Cal. App. 4th 212, 223 (2006).  To satisfy the subjective element, "the accused must be shown to have killed while under 'the actual influence of a strong passion' induced by such provocation."  <u>Moye</u>, 47 Cal. 4th at 550 (citation and internal quotation marks omitted).  Provocation sufficient to reduce murder to manslaughter need not occur instantaneously, but may occur over a period of time.

13

People v. Wharton, 53 Cal. 3d 522, 569 (1991).  The key element is not the duration of the source of provocation but whether or not defendant's reason was, at the time of his act, so disturbed or obscured by some passion to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation and reflection, and from this passion rather than from judgment. Id. at 569–70.

The California Court of Appeal rejected Petitioner's claim that there was insufficient evidence to support a finding of malice beyond a reasonable doubt.  The state court determined that the requisite malice finding could have been based on either a theory of express or implied malice:

> Here, the trial record contain substantial evidence of express malice.  From that evidence, the jury could have found that [Petitioner] manifested a deliberate intention to kill Humberto during the argument that occurred a few days before the shooting and again during his telephone conversation with Anna shortly before the murder occurred.  In addition, [Petitioner] himself made comments after the shooting which indicated that he had both planned and intended to kill Humberto.  Finally, the letters that [Petitioner] sent to Anna before trial were not only evidence of consciousness of guilt but could also have been construed as admissions of malicious intent.

> To the extent evidence of malice is lacking, there is also overwhelming evidence of implied malice.  On this record, there can be no dispute that the physical component of implied malice is satisfied; the natural consequences of firing three gunshots at an unarmed and unsuspecting man who is on his knees looking over building plans with his  contractor are dangerous to human life.  Furthermore, the threats that [Petitioner] made prior to the shooting, his behavior during the incident, and his words and actions after he shot Humberto are substantial evidence that [Petitioner] knew his actions would endanger human life and that he acted in conscious disregard for the life of Humberto Diaz.

People v. Sanchez, 2014 WL 710940, at *8.  The California Court of Appeal's determination was not an objectively unreasonable application of Jackson to the facts of the case.  See Juan H., 408 F.3d at 1275.  Viewed in the light most favorable to the prosecution, it simply cannot be said that no rational trier of fact could have found beyond a reasonable doubt that Petitioner acted with either express or implied malice in shooting and killing Humberto.  See Jackson, 443 U.S. at 324.

14

The California Court of Appeal also rejected Petitioner's claim that there was insufficient evidence to support a finding that the prosecution had disproved heat of passion beyond a reasonable doubt.  Petitioner argued, as he does here, that the trial evidence established that Humberto engaged in two types of conduct which constitute legally sufficient provocation—(1) he threatened to kick Petitioner and his grandchildren out of the Diaz home; and (2) he offered Anna money for sex—and that the prosecution failed to produce evidence from which a jury could have concluded that Petitioner was not provoked by these actions.  But the state court instead determined that substantial evidence showed that the prosecution disproved beyond a reasonable doubt both the objective and subjective components of a heat of passion theory of manslaughter:

> The jury's implicit finding that Humberto's most recent threat to change the locks was not legally sufficient provocation was supported by substantial evidence that this threat was another round in an ongoing two-sided family feud between [Petitioner] and Humberto.  The evidence regarding this dysfunctional relationship substantially supports the conclusion that Humberto's remark to his wife was another empty threat which, although frustrating and annoying, was not sufficiently provocative to lead a reasonable person in [Petitioner's] position to act rashly or without deliberation.  Testimony by several family members, including [Petitioner] himself, shows that Humberto's desire to force [Petitioner] out of the house was well known and long standing and that his was not the first time that Humberto had made this threat.  From this and other evidence in this record, the jury could reasonably have concluded that Humberto's threat to kick [Petitioner] out fo the house was not legally sufficient provocation to vitiate other substantial evidence that [Petitioner] committed this crime with malice aforethought.

> Similarly, there is substantial evidence that Humberto's proposition to give Anna money in exchange for sex would not have provoked a reasonable person to act harshly or without deliberation.  That evidence showed, among other things, that [Petitioner] had been aware of Humberto's overture for some time and, if he did not expressly approve, he implicitly condoned Anna's tactical decision to encourage Humberto in order to gain financial support.  In either event, the undisputed evidence established that [Petitioner] knew that Humberto continued to give Anna money even though she did not have sex with him and never intended to.

> Alternatively, even if the jury had found that Humberto's conduct was objectively provocative, it could reasonably have concluded that [Petitioner] was not subjectively acting under a heat of passion when he killed Humberto on September 14, 2010.  Indeed, the substantial evidence of both

express and implied malice is inconsistent with a finding that [Petitioner] was actually overcome by the heat of passion when the fatal event occurred. Not only were all of [Petitioner's] problems with Humberto's behavior long-standing, but [Petitioner] had threatened to kill Humberto in the past, and he had warned both his mother and Anna of his intention to kill Humberto. This evidence was inconsistent with the defense theory that Humberto's final threat to change the locks made [Petitioner] "snap" and act rashly without thought or reason.

Nor was the jury required to credit [Petitioner's] self-serving testimony that his passion was inflamed when Humberto refused to talk with him and treated him disrespectfully just minutes before the fatal shooting. Indeed, that testimony was contradicted by Raygoza's testimony that Humberto did not even go to the house when he came home from work on the day [Petitioner] killed him. Even if that interaction did occur prior to the shooting, the evidence about what [Petitioner] did next was consistent with the conclusion that he was not subjectively acting under a heat of passion. [Petitioner] went and retrieved a gun which he had left hidden in a bedroom closet for several months. He had or found bullets to load the gun. He then went and found Humberto, who was neither armed nor looking for a fight. Then, he shot Humberto more than once with a gun that was not easy to fire. And, finally, he fired a third shot as Humberto tried to run away. From this evidence, and the other evidence of malice aforethought summarized above, the jury could have concluded that, when [Petitioner] killed Humberto, he acted with intention, out of hatred, anger and perhaps even frustration, but not because he was provoked to act rashly or without reason.

People v. Sanchez, 2014 WL 710940, at **9-10.

The California Court of Appeal's determination that the prosecution disproved beyond a reasonable doubt both components of a heat of passion theory of manslaughter was not an objectively unreasonable application of Jackson to the facts of the case. See Juan H., 408 F.3d at 1275. Viewed in the light most favorable to the prosecution, it simply cannot be said that no rational trier of fact could have found beyond a reasonable doubt that Petitioner did not act because he was provoked to act rashly or without reason. See Jackson, 443 U.S. at 324. That the evidence could have supported a manslaughter verdict does not compel a different conclusion. See id. at 326 (reviewing court must presume that trier of fact resolved any conflicts in the evidence in favor of the prosecution and must defer to that resolution); see also Coleman v. Johnson, 132 S. Ct. 2060, 2065 (2012) (court may not substitute its judgment for that of the jury; "the only question under

16

<u>Jackson</u> is whether [the jury's finding] was so insupportable as to fall below the threshold of bare rationality" ).

Petitioner is not entitled to federal habeas relief on his insufficiency of the evidence claim.  The California Court of Appeal's rejection of the claim cannot be said to have been objectively unreasonable.  See <u>Plascencia v. Alameida</u>, 467 F.3d 1190, 1197–98 (9th Cir. 2006) (applying 28 U.S.C. § 2254(d)).

### 2.    <u>Instructional Error</u>

Petitioner claims that the trial court erred by denying his request for a special instruction which pinpointed his defense theory that he killed the victim under a heat of passion.  He argues that the trial court should have instructed the jury that, "in connection with [Petitioner's] heat of passion defense, that they need not find that the provocation would have caused a reasonable person to kill, but rather only that a reasonable person would have been provoked to act rashly, from passion rather than judgment."  Pet. at 3. The claim is without merit because the California Court of Appeal reasonably determined that the instructions given accurately and adequately explained heat of passion to the jury.

To obtain federal habeas relief for error in the jury charge, petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991).  The error may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  <u>Id</u>.  Petitioner also must show actual prejudice from the error, i.e., that the error had a substantial and injurious effect or influence in determining the jury's verdict, before the court may grant federal habeas relief.  <u>Calderon v. Coleman</u>, 525 U.S. 141, 146 (1998) (citing <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)).

A state trial court's failure to give an instruction does not alone raise a ground cognizable in federal habeas corpus proceedings.  <u>Dunckhurst v. Deeds</u>, 859 F.2d 110, 114 (9th Cir. 1988).  Due process does not require that an instruction be given unless the

evidence supports it.  See Hopper v. Evans, 456 U.S. 605, 611 (1982); Menendez v. Terhune, 422 F.3d 1012, 1029 (9th Cir. 2005).  The defendant is not entitled to have jury instructions raised in his or her precise terms where the given instructions adequately embody the defense theory.  United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996); United States v. Tsinnijinnie, 601 F.2d 1035, 1040 (9th Cir. 1979).  The test for constitutional error is whether there is a "reasonable likelihood" the jury misapplied the instructions.  McGuire, 502 U.S. at 72.

Furthermore, the omission of an instruction is less likely to be prejudicial than a misstatement of the law.  Walker v. Endell, 850 F.2d 470, 475–76 (9th Cir. 1987).  An habeas petitioner whose claim involves a failure to give a particular instruction, as opposed to a claim that involves a misstatement of the law in an instruction, bears an "especially heavy burden."  Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury.  See Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995).  An examination of the record is required to see precisely what was given and what was refused and whether the given instructions adequately embodied the defendant's theory.  See Tsinnijinnie, 601 F.2d at 1040.  In other words, it allows a determination of whether what was given was so prejudicial as to infect the entire trial and in doing so, deny due process.  See id.

The California Court of Appeal summarized the instructions given to the jury on Petitioner's heat of passion theory as follows:

> The jury received separate instructions regarding the crimes of murder with malice aforethought, first degree murder, and voluntary manslaughter.
>
> The trial court then used CALCRIM No. 570 to instruct the jury regarding the crime of voluntary manslaughter as a lesser included

offense of the charged murder.  Pursuant to that pattern instruction, which is based on the heat of passion theory of manslaughter, the jury was instructed as follows:

"A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion.   [¶] The defendant killed someone because of a sudden quarrel or in the heat of passion if:

"1. The defendant was provoked; [¶] 2. As a result of the provocation, the defendant acted rashly and under the influence of intense emotion that obscured (his/her) reasoning or judgment; [¶] AND 3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather that from judgment.

. . .

The jury also received the following special instruction regarding the role of provocation in determining whether [Petitioner] committed first degree murder, second degree murder, or manslaughter: "Provocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter.  The weight and significance of the provocation, if any, are for you to decide. [¶] If you conclude that the defendant committed a murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder.  Also consider the provocation in deciding whether the defendant committed murder or manslaughter."

Sanchez, 2014 WL 710940, at **11–12.

Petitioner argued, as he does here, that CALCRIM No. 570 was incomplete and/or misleading because it did not expressly instruct the jury that his heat of passion defense did not require it to find that a reasonable person in Petitioner's position would have been provoked to kill, but rather only that a reasonable person in Petitioner's position would have been provoked to act rashly, from passion rather than judgment.  But the California Court of Appeal rejected Petitioner's argument and determined that CALCRIM No. 570 is a correct and adequate description of California law:

As a general rule, the " ' "defendant has a right to an instruction that pinpoints the theory of the defense . . . .' " [Citation.] The court may, however, 'properly refuse an instruction offered by the defendant if it incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not

supported by substantial evidence [citation].' [Citation.]" (People v. Burney (2009) 47 Cal.4th 203, 246; see also People v. Moon (2005) 37 Cal.4th 1, 30.)

In the present case, the trial court refused to give [Petitioner's] special instruction because it was potentially confusing and because CALCRIM No. 570 accurately and adequately instructed the jury regarding the standard of provocation sufficient to reduce a murder to manslaughter. On appeal, [Petitioner] does not challenge the accuracy of any language in CALCRIM No. 570. Instead, he argues this instruction is incomplete and/or misleading because it does not expressly instruct that the jury is not required to find that a reasonable person in the defendant's position would have been provoked to kill. We strongly disagree with this contention which is not supported by any relevant authority. Indeed, this claim is inconsistent with our Supreme Court's recent holding in [People v. Beltran (2013) 56 Cal.4th 935], a case upon which [Petitioner] mistakenly relies in his reply brief.

In Beltran, supra, 56 Cal.4th 935, the defendant was convicted of second degree murder for the stabbing death of his former girlfriend, the jury having rejected his defense that he killed in the heat of passion. On appeal, he argued that the trial court erroneously instructed the jury regarding the standard of provocation necessary to reduce murder to manslaughter by using a 2006 version of CALCRIM No. 570 which stated, in part: " 'In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.' " (Id. at p. 954.) The defendant argued this instruction was misleading because it encouraged the jury to question whether "an average person would react physically and kill," when the only relevant question was whether an average person would react "mentally, experiencing obscured reason precluding the formation of malice." (Id. at p. 945.)

The Court of Appeal agreed with the Beltran defendant and reversed the judgment. (Beltran, supra, 56 Cal.4th at p. 945.) It found that the language in CALCRIM No. 570 quoted above was ambiguous because it " 'did not expressly limit the juror's focus to whether the provocation would have caused an average person to act out of passion rather than judgment' " and because it allowed or maybe even encouraged "jurors to consider whether the provocation would cause an average person to do what the defendant did; i.e., commit a homicide." (Id. at p. 954.)

The People sought review of the appellate court's decision in Beltran, supra, 56 Cal.4th at page 946, arguing there was no reversible instructional error. The People also took the position that the 2006 version of CALCRIM No. 570 did not actually go far enough, and that "the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill." (Id. at p. 946.)

The Beltran court granted review in order to "clarify what kind of provocation will suffice to constitute heat of passion and reduce a murder to manslaughter." (Beltran, supra, 56 Cal.4th at p. 938.) To answer that question, the court reaffirmed an almost 100-year-old test for assessing provocation in this context: "[W]hen examining heat of the passion in the context of manslaughter, the fundamental 'inquiry is whether or not the defendant's reason was, at the time of his act, so disturbed or obscured by some passion . . . to such an extent as would render ordinary men of average disposition liable to act rashly or without due deliberation

and reflection, and from this passion rather than judgment.' [Citiation.]" (Id. at ¶. 938–939, quoting People v. Logan (1917) 175 Cal. 45, 49.)

The Beltran court then rejected the People's theory that provocation requires a finding "not only that an ordinary person of average disposition would be liable to act rashly and without reflection, but that such a person would act rashly in a particular manner, by killing." (Beltran, supra, 56 Cal.4th at p. 942.) The court reasoned that a test that asks whether the person of average disposition would be moved to kill confuses on the wrong thing: "The proper focus is placed on the defendant's state of mind, not on the particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection. . . . [T]he anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, provocation is not evaluated by whether the average person would act in a certain way: to kill. Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (Id. at p. 949.)

However, the Beltran court also disagreed with the Court of Appeal's analysis of the 2006 version of CALCRIM No. 570; it found that the challenged language in that instruction was neither ambiguous nor inadequate. (Beltran, supra, 56 Cal.4th at p. 954.) The court reasoned that "[t]elling the jury to consider how a person of average disposition 'would react' properly draws the jury's attention to the objective nature of the standard and the effect the provocation would have on such a person's state of mind." (Id. at . 954.)

On appeal, [Petitioner] contends that Beltran supports his claim of instructional error because that case "reaffirm[s]" the legal principle reflected in the pinpoint instruction that the trial court refused to give, i.e., that it is not necessary for the jury to conclude that a reasonable person would have been provoked to kill. But this contention completely misses the relevant point. Beltran did not hold or in any way intimate that this legal principle is part of the standard for assessing provocation in this context. Indeed, [Petitioner] provides neither authority nor any sound reason for his contention that he was entitled to a pinpoint instruction on a principle of law that is not part of the legal test for assessing provocation.

Furthermore, [Petitioner] conveniently overlooks the fact that Beltran, supra, 56 Cal.4th 935, undermines his claim that the current version of CALCRIM No. 570 is either misleading or insufficient to instruct the jury regarding the proper standard of assessing provocation when there is a question whether the defendant killed in the heat of passion. The Beltran court approved the 2006 version of CALCRIM No. 570 because it found that the challenged language did not mislead the jury or improperly focus on the jury's attention on the defendant's act rather than his state of mind. (Id. at p. 954.)

Any lingering concern about potentially ambiguous language in the 2006 version of CALCRIM No. 570 was resolved in 2008 when the instruction was revised in order to clarify the standard of provocation by eliminating the language that had troubled the appellate court panel that decided Beltran and replacing it with the following language: " 'In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment.' " (Beltran, supra, 56

Cal.4th at p. 954, fn 14.) We reject [Petitioner's] unsupported notion that this language is misleading or incomplete.

Finally, in our opinion, Beltran highlights a material flaw in [Petitioner's] special instruction. Beltran teaches that the "proper focus" of the provocation inquiry is placed on the defendant's state of mind, not on the particular act." (Beltran, supra, 56 Cal.4th at p. 949.) But [Petitioner's] proposed instruction focused on the conduct of the defendant rather than his state of mind; by telling the jury that it did not have to find that an average person in [Petitioner's] position would "have been provoked to kill," this special instruction strayed from the proper inquiry by diverting the jury's attention to the act that [Petitioner] committed rather than his state of mind. In other words, the special instruction that [Petitioner] advocates here is the opposite side of the same flawed theory that the People advanced in Beltran. It would have instructed the jury to focus on the conduct that the provocation might cause in an ordinary person by telling them that said conduct does not have to be a killing. That is not the proper standard for assessing provocation.

For all these reasons, we conclude that the trial court did not err by refusing to give the pinpoint instruction that [Petitioner] proposed.

Sanchez, 2014 WL710940, at **11-14.

The California Court of Appeal's rejection of Petitioner's instructional error claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts. See 28 U.S.C. § 2254(d). The state court's determination that the instructions given, namely CALCRIM No. 570, accurately explained heat of passion under California law is binding on this Court, see Bradshaw v. Richey, 546 U.S. 74, 76 (2005) (state court's interpretation of state law, including one announced on direct appeal of challenged conviction, binds federal court sitting in habeas corpus), and its determination—that the instructions given did not mislead the jury as to Petitioner's heat of passion defense—was not objectively unreasonable. It simply cannot be said that there is a reasonable likelihood that, without the requested pinpoint instruction, the jury misapplied the instructions given, which repeatedly and accurately explained that the key inquiry for heat of passion was whether a reasonable person exposed to the claimed provocation would "act rashly" and "from passion rather than judgment," in a way that rendered the trial fundamentally unfair. See McGuire, 502 U.S. at 72. Nor can it be said that the failure to give the requested pinpoint

instruction had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637.  After all, the trial court accurately instructed the jury on the requirements for reducing murder to manslaughter based on a heat of passion defense under California law and ample evidence supported the jury's rejecting the defense and instead finding that Petitioner committed murder rather than manslaughter. Petitioner is not entitled to federal habeas relief on his instructional error claim.

### 3. Prosecutorial Misconduct

Petitioner claims his due process rights were violated during closing arguments because the prosecutor "erroneously told jurors that how a reasonable person would have responded to the provocation was relevant to their determination [of whether] the killing was manslaughter or murder," and "erroneously shifted the burden of proving voluntary manslaughter to the defense." Pet. at 3.  The claim is without merit because the California Court of Appeal reasonably determined that there was no reasonable likelihood that the jury misconstrued or interpreted the prosecutor's comments in an improper manner.

A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." Darden v. Wainwright, 477 U.S. 168, 181 (1986); Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  Under Darden, the first issue is whether the prosecutor's conduct was improper; if so, the next question is whether such conduct infected the trial with unfairness. Tan v. Runnels, 413 F.3d 1101, 1112 (9th Cir. 2005).  But even then, federal habeas relief is in order only if the denial of due process based on prosecutorial misconduct had a substantial and injurious effect or influence in determining the jury's verdict. See Brecht, 507 U.S. at 637.  Petitioners must establish that the misconduct resulted in "actual prejudice." Id.

//

The California Court of Appeal found that Petitioner had forfeited his claim of prosecutorial misconduct because he did not object to the prosecutor's allegedly improper comments at trial. But it nonetheless determined that the claim was without merit. The court explained:

> [Petitioner] first contends that the prosecutor misstated the legal test for determining whether a defendant acted in the heat of passion by telling the jury that the question whether [Petitioner] committed murder or manslaughter depended on whether he acted reasonably by killing Humberto. To support this claim, [Petitioner] strings together isolated statements from different parts of the prosecutor's lengthy summation. After considering the challenged remarks in the context of the arguments the prosecutor made, we conclude that it is not reasonably likely that the jury construed the prosecutor's comments in an improper or inappropriate manner. ([People v.Wilson (2005) 36 Cal.4th 309, 337.])

> To be sure, the prosecutor characterized [Petitioner's] decisions and conduct as unreasonable. However, he did not argue or intimate that the test for determining whether a person kills in the heat of passion requires the jury to find that [Petitioner] acted reasonably by killing Humberto. To the contrary, while arguing that there was a dearth of evidence that [Petitioner] committed a voluntary manslaughter, the prosecutor correctly recounted the three requirements for finding a heat of passion killing: that the defendant was provoked; that the defendant acted under that provocation; and that "this provocation has to be such that it would have caused the person of average disposition to act rashly without deliberation; that is, from passion rather than judgment."

> Any lingering danger that the jury might have misrepresented or been misled by the prosecutor's comments was eliminated by the jury instructions the court gave in this case. We presume that the jury followed those instructions. (People v. Boyette (2009) 29 Cal.4th 381, 436.) We also presume that the " 'the jury treated the court's instructions as statements of law, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' " (People v. Seaton 2001 26 Cal.4th 598, 646; see also People v. Samayoa (1997) 15 Cal.4th 795, 844.)

> Here, as discussed above, the jury was instructed with CALCRIM No. 570, which reinforced the prosecutor's correct recitation of the test for determining whether a killing which might otherwise be murder was manslaughter because the defendant acted under the heat of passion. Furthermore, the jury was also instructed with CALCRIM No. 222, which told them that "[n]othing that the attorneys say is evidence." This instruction further reduced the likelihood that the jury would misconstrue the prosecutor's statements about the unreasonable nature of [Petitioner's] conduct.

//

24

[Petitioner's] second argument is that the prosecutor shifted the burden of proving voluntary manslaughter onto [Petitioner] by telling the jury that the law sets up "a lot of barriers" and "demands" before a jury can find that a defendant committed this offense.

The theme of the prosecutor's closing argument was that [Petitioner] killed Humberto out of hatred and anger but that he did not kill under a heat of passion.  In pursuing that theory, the prosecutor argued that the evidence did not establish the elements of heat of passion voluntary manslaughter. However, the prosecutor never argued that the defendant had the burden of proof with respect to this or any other matter.  The jury was repeatedly instructed about the prosecutor's burden of proof in this case, including it burden of proving beyond a reasonable doubt that the defendant "did not kill as the result of a sudden quarrel or in the heat of passion."  As noted above, we presume on appeal that the jury followed these instructions.  (People v. Boyette, supra, 29 Cal.4th at p. 436.)  Thus, we are not persuaded there was a reasonable likelihood that the jury interpreted the prosecutor's comments as imposing any burden of proof on the defendant in this case.

For all of these reasons, we reject [Petitioner's] contention that the prosecutor committed prejudicial misconduct during closing argument.

People v. Sanchez, 2014 WL 710940, at **15–16.

The California Court of Appeal's rejection of Petitioner's prosecutorial misconduct claim was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent, or based on an unreasonable determination of the facts.  See 28 U.S.C. § 2254(d).  The record confirms that the prosecutor did not misstate at closing argument the test for determining whether Petitioner killed in the heat of passion; rather, as the California Court of Appeal noted, the prosecutor properly stated and explained the requirements for finding a heat of passion killing under CALCRIM No. 570—that Petitioner was provoked, that he acted under that provocation and that the provocation had to be such that it would have caused a person of average disposition to act rashly without deliberation; that is, from passion rather than judgment.  Petitioner's claim that the prosecutor misstated the requirements for finding a heat of passion killing fails for failure to establish that the prosecutor's statements were improper.  See Tan, 413 F.3d at 1112 (under Darden, petitioner must establish that prosecutor's conduct was improper and that improper conduct infected trial with unfairness).  Petitioner's claim also fails for failure to

1  establish that the prosecutor's statements infected the trial with unfairness.  See id.  After

2  all, the California Court of Appeal reasonably determined that any danger that the jury

3  might have misrepresented or been misled by the prosecutor's statements regarding the

4  requirements for finding a heat of passion killing was eliminated by the instructions given

5  to the jury—namely CALCRIM No. 570, which, as discussed above, is a correct statement

6  of the requirements for finding a heat of passion killing under California law, and

7  CALCRIM No. 222, which states in relevant part that "[n]othing that the attorneys say is

8  evidence."  Cf. Richardson v. Marsh, 481 U.S. 200, 211 (1987) (juries are presumed to

9  follow their instructions).

10        Petitioner's claim that the prosecutor improperly shifted the burden of proving a

11  heat of passion killing to the defense similarly fails.  The record confirms that the

12  California Court of Appeal reasonably determined that the prosecutor never argued that

13  the defense had the burden of proving a heat of passion killing and that, in view of the jury

14  having been instructed repeatedly about the prosecutor's burden of proof in this case

15  (including his burden of proving beyond a reasonable doubt that Petitioner did not kill as a

16  result of a sudden quarrel or in the heat of passion), there was no reasonable likelihood

17  that the jury interpreted the prosecutor's comments as imposing any burden of proof on

18  Petitioner.  Cf. id.

19        Petitioner is not entitled to federal habeas relief on his prosecutorial misconduct

20  claim.  The California Court of Appeal's rejection of the claim was not objectively

21  unreasonable and there is no indication that the prosecutor's alleged statements and

22  comments during closing argument had a substantial and injurious effect or influence on

23  the jury's verdict.  See Brecht, 507 U.S. at 637; see also Shoemaker v. Taylor, 730 F.3d

24  778, 789–90 (9th Cir. 2013) (although portions of prosecutors argument were improper,

25  no prejudice because prosecutor properly noted all factors jury should consider and there

26  was strong evidence of guilt).

27

28                                          26

### CONCLUSION

After a careful review of the record and pertinent law, the Court is satisfied that the petition for a writ of habeas corpus must be DENIED.

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a certificate of appealability (COA) under 28 U.S.C. § 2253(c) is also DENIED because Petitioner has not demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

The clerk shall enter judgment in favor of Respondent, terminate all pending motions as moot, and close the file.

SO ORDERED.

DATED: <u>March 14, 2016</u>

CHARLES R. BREYER
United States District Judge

G:\PRO-SE\CRB\HC.15\Sanchez, L.15-1629.denial.final.wpd